[No. 51473-3-I. Division One. November 24, 2003.]

THE STATE OF WASHINGTON, *Respondent*, v. ANTHONY OREN FLINN, *Appellant*.

234

*Susan F. Wilk* (of *Washington Appellate Project*), for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Deric Martin, Deputy*, for respondent.

KENNEDY, J. — Anthony O. Flinn appeals his conviction for possession of an incendiary device, contending that the State was required to prove that he designed the device for the purpose of willful destruction. He also contends that the trial court violated his right to a speedy trial under CrR 3.3 by considering the dates of the fall judicial conference in rescheduling the trial, and should have dismissed the case

for prosecutorial mismanagement under CrR 8.3(b). We reject these contentions and affirm the conviction.

## FACTS

In the early morning hours of May 6, 2002, Seattle Police responded to a report of a burglar alarm at the Meany Middle School Complex. They arrived to find Anthony Flinn on the roof of the school, pacing back and forth and shouting obscenities. Officers could hear Flinn breaking fixtures and equipment on the roof and throwing things. Officer Anderson identified himself as a police officer, and Flinn responded with an epithet. A school janitor arrived and let the officers into the school, where they gained access to the roof and arrested Flinn. Flinn told the officers that certain forces were after him and that they were going to shoot him. And he said that he had made a Molotov cocktail. The officers recovered, from the roof of the school, a gasoline-filled beer bottle wrapped in a red sock and capped with a wick-like cloth.

At the police station, Flinn said that he had ingested a large amount of methamphetamines, and that he had been chased all night by "forces" that had been firing shots at him. Because he wanted to show his pursuers that he was "serious" he made several Molotov cocktails. Police subsequently found a second Molotov cocktail in the backyard of a residence located near the school, and the broken remnants of two more—one on the roof where Flinn had been captured, and another that had been thrown from the roof through a window of the school.

The State charged Flinn with attempted arson in the second degree, possession of an incendiary device, and malicious mischief in the first degree. Flinn was arraigned on May 21, 2002, and the matter was set for trial on July 18, 2002.

On July 5, 2002, the defense sought and obtained a continuance to August 12, 2002, to obtain a psychological evaluation of Flinn. Flinn waived speedy trial until August

14, 2002. On August 2, 2002, the defense moved for a second continuance, in that more time was needed to prepare a mental defense to the charges. On August 21, 2002, the defense provided the State with notice of intent to assert a diminished capacity defense, and a copy of a report written by Dr. Kenneth Muscatel. The defense sought an additional continuance to September 9, 2002, and Flinn again waived speedy trial to that date.

Dr. Muscatel's report did not include a curriculum vitae or a list of materials, such as mental health records and psychological tests or other diagnostic tools upon which the doctor had relied in reaching his opinion that Flinn was suffering from drug-induced psychosis at the time of the offenses. The prosecutor repeatedly tried to contact defense counsel to request these materials, but got no response, in that defense counsel was on vacation.

On September 9, 2002, the State filed a motion to compel discovery and sought a continuance to obtain the missing information, and to secure a rebuttal expert. The prosecutor requested two weeks in order to accomplish this.

Flinn objected to the State's request for continuance, and revealed for the first time that Dr. Muscatel had not contacted any of Flinn's prior mental health providers to obtain mental health records because there were none, had performed no diagnostic testing, and had relied only upon the police reports and his interview with Flinn in reaching his opinion. Flinn argued that the State had already had plenty of time to interview Dr. Muscatel and to get its own expert on board.

Criminal Presiding Judge Jeffrey M. Ramsdell found good cause to continue the trial, and expressed a desire "to keep [the case] on a short leash but not so short that [the parties would] have to come back again [to seek another continuance]." Clerk's Papers at 21. The court rescheduled the trial for October 15, 2002. When defense counsel asked if it could not be sooner than that, Judge Ramsdell indicated that he had been trying to work around the impending fall judicial conference set for early October that year.

Flinn subsequently waived his right to a jury trial and stipulated to a bench trial before Judge Robert H. Alsdorf. That trial commenced on October 22, 2002. Flinn asked Judge Alsdorf to dismiss for violation of his CrR 3.3 speedy trial rights and for prosecutorial mismanagement under CrR 8.3(b), and the court denied the motion. After three days of trial, Judge Alsdorf acquitted Flinn of the attempted arson and malicious mischief charges, but found him guilty of possession of an incendiary device.

Judge Alsdorf entered the following findings of fact:, all of which are unchallenged on appeal:

1. The preponderance of circumstantial evidence is that on or shortly before May 6, 2002, the defendant Anthony Flinn ingested a large quantity of methamphetamines. His behavior when observed and ultimately apprehended and arrested by law enforcement officers was consistent with a person who is substantially under the influence of alcohol or drugs. Testing at Harborview confirmed the presence of methamphetamines but not alcohol in his body.

2. The preponderance of circumstantial evidence is that when he was first observed and apprehended by law enforcement officers, defendant believed he was still in danger from and being pursued by unknown assailants variously described by him as "The Man" or "Police" or "FBI".

3. The preponderance of the circumstantial evidence is that defendant believed that first by stealing gasoline from a Volkswagen and then by making Molotov Cocktails, and by engaging in other acts such as stealing a flag and a propane tank, he could convince his unknown (but non-existent) pursuers and potential assailants that he was serious and that they should leave him alone.

4. The preponderance of the circumstantial evidence is that defendant believed that despite these efforts, he was still being pursued, and that defendant believed he could hear bullets whizzing past his ears, and as a result he climbed a tree and jumped onto the roof of a structure at the Miller Community Center—Meany Middle School complex of buildings, where he began breaking windows and tearing off roofing vents and other structural items in order to gain attention and secure

assistance in defending himself from his perceived pursuers and assailants.

5. The preponderance of the evidence is that defendant did not attempt to ignite any of the bottles he had in his possession before or after throwing them.

6. The preponderance of the evidence is that defendant had sufficient perception of the physical world around him to be able to use a lighter and to ignite the bottles had he decided to do so.

7. While there is some evidence suggesting the possibility that defendant has a pre-existing mental disease or defect, the evidence is insufficient to permit the Court to make a finding thereon; indeed, that evidence is so scanty as to be unlikely, standing alone, to raise even a question of reasonable doubt.

8. Despite the absence of credible competent evidence of any diagnosable genetic or other chronic mental disease or defect, the preponderance of the evidence is that defendant was in a state of drug-induced psychosis at the time of the acts charged in this case.

9. The preponderance of the evidence is that defendant was sufficiently aware of the physical world to be able to remember where he was, and where he had cut the Volkswagen's gas line, and to plug the vehicle's cut fuel line in order to avoid further fuel spillage or leakage after he took what he perceived he needed to construct the incendiary devices that he thought would provide him with'a defense of sorts against his perceived pursuers and assailants. Nonetheless, the preponderance of the evidence is also that defendant suffered from delusions that some vehicles in his vicinity contained pursuers and also from hallucinations that he was actually being chased by real people and being fired at by real firearms and live ammunition. As a result, it is clear that the defendant could intend to do, and could competently perform, certain physical acts in a misguided attempt to defend himself from his non-existent pursuers, but that his actions cannot be deemed to have been taken with full knowledge of the real world or with malice toward either Meany Middle School or with gratuitous ill will even to the owner of the Volkswagen whose fuel line he had cut. His actions destroying property on the roof of the Meany Middle School were not taken to vex, harass or annoy any real person

or entity, but to attract attention and to try to obtain what he perceived would be possible help in defending himself from what are now indisputably known to be imaginary assailants.

10. The preponderance of the evidence is that defendant knowingly manufactured and possessed an incendiary device, and that as a "Molotov Cocktail" it was capable of being used to ignite and/or fuel a fire and to be an instrument of willful destruction. However, the preponderance of the evidence also is that defendant had no intent to use it maliciously for the destruction of the property of others, or to vex, annoy or injure any person, entity or institution, but to use it only if necessary in the course of what he by delusion and hallucination perceived to be a crude form of self-defense. The preponderance of the evidence also is that defendant at no time made an effort to ignite any gasoline or propane container. Had he been in full control of his mental faculties, one could infer that there would be no reasonable explanation for manufacture and possession of an incendiary device other than malice; in this case, the evidence strongly supports the finding of a non-malicious albeit grossly unrealistic mental state. There is no direct evidence and no credible circumstantial evidence that he manufactured the incendiary devices with the intent to burn or damage any structure or property of another.

Clerk's Papers at 32-34.

Of the following conclusions of law, Flinn challenges only Judge Alsdorf's conclusion that Flinn was guilty of possession of an incendiary device:

11. While this Court has found that the preponderance of the evidence supports many of the defendant's arguments, such a finding is not necessary for any of the judgments reached by the Court in this case. Acquittal is necessary on any charge where there is reasonable doubt. Where the Court has referenced a preponderance of the evidence, it is for the purpose of identifying not merely a reasonable doubt but in fact a very substantial doubt as to one or more elements of what the State must prove in order to obtain a conviction.

12. There is reasonable doubt that defendant took a substantial step toward the crime of Arson in the Second Degree with the intent to commit that crime. While he took physical steps which could in other circumstances be deemed consistent with

and corroborative of an intent to commit that crime, this Court has concluded that he did not do such acts in this case in a manner which was "knowing and malicious" but instead did so as a result of a drug-induced psychosis which was sufficient to constitute the defense of diminished capacity.

13. There is reasonable doubt that defendant damaged property of another knowingly and maliciously or with an evil intent to vex, annoy or injure another. This Court has concluded that he likely damaged property in what, as a result of a drug-induced psychosis, he perceived as a way to obtain assistance; this is sufficient to raise reasonable doubt as to his capacity to achieve the level of culpability necessary for conviction.

14. The law of our State provides that no act committed by a person while in a state of voluntary intoxication falls outside the purview of the criminal laws simply by reason of that condition, but that evidence of intoxication is relevant to the determination of whether a defendant acted or was able to act with the necessary level of intent. In this case, the Court has concluded that defendant's ingestion of drugs prevented him from being capable of maliciously performing the charged acts. Because counts I and III require that the State prove beyond a reasonable doubt that defendant's wrongful acts were both knowing *and* malicious, the State has failed to meet its burden of proof on those Counts.

15. Malice is not a necessary element of the crime charged in Count II, Possession of an Incendiary Device in violation of RCW 9.40.120. The Court has concluded that defendant possessed, manufactured and disposed of an incendiary device, and that he knew it to be such. The presence of imaginary pursuers and assailants did not prevent him from knowing what he possessed and manufactured and ultimately disposed of. Count II has been proven beyond a reasonable doubt.

Clerk's Papers at 34-35.

## ANALYSIS

Issue 1: Did the trial court err in finding Flinn guilty of possession of an incendiary device absent proof that he designed the Molotov cocktails for the purpose of willful destruction?

The State charged Flinn with possession of an incendiary device in violation of RCW 9.40.120, which provides:

Every person who possesses, manufactures, or disposes of an incendiary device *knowing it to be such* is guilty of a felony, and upon conviction, shall be punished by imprisonment in a state prison for a term of not more than ten years.

(Emphasis added.)

RCW 9.40.110(2) provides:

"Incendiary device" means any material, substance, device, or combination thereof which is capable of supplying the initial ignition and/or fuel for a fire *and is designed to be used as an instrument of wilful destruction*. However, no device commercially manufactured primarily for the purpose of illumination shall be deemed to be an incendiary device for purposes of this section.

(Emphasis added.)

Based on these statutes, Flinn argues that the State was required to prove not only that the Molotov cocktails were capable of starting a fire, but also that Flinn "designed [the Molotov cocktails] to be used as . . . instrument[s] of willful destruction." Br. of Appellant at 15. Given the trial court's factual finding that there was no direct or circumstantial evidence that Flinn "manufactured the incendiary devices with the intent to burn or damage any structure or property of another," Finding of Fact 10, Flinn contends that it was error to conclude that he unlawfully possessed the devices. Essentially, Flinn claims that he cannot be convicted of possession of an incendiary device absent proof that he also manufactured the device with the specific intent to use it for willful destruction.

The State argues in response that the purpose of RCW 9.40.110(2) is to define a statutory term, not to add an essential mental element of the crime, and that the clear purpose of the phrase "designed for purposes of wilful destruction" is to further describe the devices included in the definition of "incendiary device" rather than the mental state of the designer. Put another way, the State argues that the language indicates that a person violates the statute by possessing a device that he knows is made to destroy, whether or not he intends to destroy anything on the charged occasion. The State also reviews the legislative history of the statute, arguing that the addition of knowledge in the 1971 amendment to RCW 9.40.120, as the only mens rea element, further supports its view.

██ The meaning of an unambiguous statute is derived from its actual language, and the words are given the meaning provided by the statute or their ordinary meaning if not defined in the statute. *State v. Smith*, 117 Wn.2d 263, 270-71, 814 P.2d 652 (1991). RCW 9.40.120 is not ambiguous. The language of RCW 9.40.120 clearly means that it is a felony for any person to knowingly possess or manufacture or dispose of an incendiary device. Because these actions are listed in the disjunctive, it is clear that a person who only knowingly possesses or knowingly disposes of an incendiary device—regardless of who designed it—may be charged with a violation of this statute. Flinn's proposed interpretation requiring proof that the defendant himself or herself actually manufactured the device with a specific intent is therefore unreasonable.

Moreover, here, the trial court specifically found that Flinn's Molotov cocktails were actually incendiary devices under the statutory definition, in that they were "capable of being used to ignite and/or fuel a fire and to be an instrument of willful destruction." Finding of Fact 10. Flinn did not assign error to this finding. Because the trial court also found that he knowingly possessed the Molotov cocktails, it was not error to conclude that Flinn was guilty of violating RCW 9.40.120.

Issue 2: Did the trial court violate CrR 3.3 by granting the State's motion to continue the trial date beyond Flinn's speedy trial expiration date?

█ Flinn contends that Criminal Presiding Judge Ramsdell abused his discretion by granting the State's motion for a continuance on September 9, 2002, and that Judge Alsdorf abused his discretion by refusing to dismiss the case when Flinn raised the issue again on the first day of trial. A trial court's decision to grant or deny a continuance under CrR 3.3 " 'will not be disturbed absent a showing of a manifest abuse of discretion.' " *State v. Williams*, 104 Wn. App. 516, 520-21, 17 P.3d 648 (2001) (quoting *State v. Cannon*, 130 Wn.2d 313, 326, 922 P.2d 1293 (1996)).

Flinn complains that Judge Ramsdell failed to find good cause for the continuance, failed to state his reasons for granting the continuance on the record, and improperly considered a judicial conference as a justification to further extend the time for trial. A careful review of the record indicates that the court fully explained the reasons on the record.

Following the State's motion to compel discovery of any materials relied on by Dr. Muscatel for the evaluation, defense counsel stated that there were no additional materials to produce. In light of that information, and the fact that it was not disclosed until that morning, the prosecutor asked for a continuance to obtain an expert to evaluate Flinn and prepare a rebuttal. In response to Judge Ramsdell's question of how long this would take, the prosecutor assumed that he would need a couple of weeks. Then the following exchange took place:

> [STATE]: And I noted, I mean I noted at Omnibus we talked about what would be a realistic trial date. We had hoped that this would be but I don't think it is. I mean it's now the State does need time to do this.
>
> [COURT]: Okay. Well, um, I'm hearing the defendant doesn't want to waive speedy but I'm not hearing an argument that, other than that, there isn't good cause at least to get the State's

expert on board. I think it is really a question of how long is a reasonable amount of time under the circumstances.

[DEFENSE COUNSEL]: And, your Honor, I guess for the record, we would object to the Continuance that there isn't good cause—that three weeks was ample time for the State to be prepared for today.

[STATE]: And, your Honor, I would point out that Counsel has had two Continuances of the trial date in order to get an expert on his side to evaluate the defendant.

[COURT]: Okay. All right. Tell me if this date will work for you [because] I will find good cause for the Continuance under the circumstances but I want to keep it on a short leash but not so short that you have to come back again. . . . [H]ow would October 15th work for both of your schedules?

[DEFENSE COUNSEL]: Wow.

[STATE]: It's acceptable to the State.

. . . .

[DEFENSE COUNSEL]: I still, we would ask that the case be set a little earlier. I know Mr. Flinn is anxious, it seems . . . that six weeks is more than plenty of time for the State to be prepared in this. And, as I stated most of the investigations—

[COURT]: Well, I am, also, working around judicial conference and I'll be frank with you, I am trying to work it in as short a period of time as I can but still make it so that we're not back here again pushing for another week or two and I am trying to work around the judicial conference.

[DEFENSE COUNSEL]: When is the judicial conference?

[COURT]: It's in the beginning of October. So otherwise I would set it right in there. So how about October 15, that'll work for you? Anybody got any vacations I need to know about?

. . . .

[STATE]: And, your Honor, we have already held that on this Hearing but perhaps we can schedule an Omnibus Hearing a couple of week [sic] before to make sure—

. . . .

[COURT]: How about October 4 for Omnibus and we'll see if there's any last minute glitches that we need to work out? And,

ah, Mr. Cook,[1] if for some reason . . . you figure you don't need another [evaluation] or whatever, I mean, let me know and we can always accelerate the trial date and get the matter processed. I'm just making the assumption you need to do everything and if you don't, I'd like to know that.

Clerk's Papers at 20-23, Tr. of Sept. 9, 2002 Hr'g.

Based on this record, it is clear that Judge Ramsdell found good cause for a continuance given that the prosecutor, having learned just that morning that Dr. Muscatel did not rely on any diagnostic tests or medical history, wished to obtain a rebuttal expert to prepare a second evaluation. It is also clear that while the upcoming judicial conference was a significant factor in the date to be selected, Judge Ramsdell was also concerned with keeping the time of the continuance short, but not so short that counsel would likely ask for yet another continuance in a case that had already been continued three times. We see no abuse of discretion here.

■■■ Specifically, we deem it appropriate for the court to have considered the upcoming fall judicial conference. Judge Ramsdell made this ruling on September 9, 2002. We take judicial notice that on July 1, 2002, our Supreme Court adopted GR 26, Washington's mandatory continuing judicial education rule. The rule requires all judges in Washington to obtain 45 hours of approved continuing judicial education every three years. At the same time, the legislature, in response to the State's monetary crisis, cut state funding that previously had been approved for court operations during the then-current biennium—meaning that courts could not spend certain funds already allocated in their budgets for operating expenses ranging from support-staff salaries to supplies, and particularly for continuing judicial education. Thus, for many if not most judges, the only affordable means of obtaining mandatory continuing judicial education was then and still remains by attendance at the annual judicial conference—and for trial court judges

---

[1] Mr. Cook was the prosecutor at the hearing.

that means the fall conference. Thus, Judge Ramsdell knew that there would be a shortage of available judges during the fall conference. Judges cannot obtain mandatory continuing judicial education while presiding over trials, and face discipline for failing to obtain the necessary credits, leaving presiding judges with little choice but to consider impending judicial conferences when setting or resetting trial dates in criminal cases.

Former CrR 3.3(h)(2) (2001) and current CrR 3.3(f)(2) permit the court to continue a trial to a specified date when "required in the administration of justice and the defendant will not be [substantially] prejudiced in the presentation of [the] defense." Flinn claims no prejudice other than the fact that he remained in jail during the time intervening between August 21 and the October trial—for which credit was granted at the time of sentencing in any event. Instead, he equates the fall judicial conference with routine court congestion, which is not an unforeseen circumstance that justifies continuing a trial beyond the expiration date. *See, e.g., State v. Smith,* 104 Wn. App. 244, 251-52, 15 P.3d 711 (2001). Although annual judicial conferences are hardly an "unforeseen circumstance" since they occur annually on dates that are known well in advance, the mandatory continuing judicial education credits that are available at such conferences at an affordable price make attendance highly desirable. As our Supreme Court said in the preamble to GR 26:

> The protection of the rights of free citizens depends upon the existence of an independent and competent judiciary. The challenge of maintaining judicial competence requires ongoing education of judges in the application of legal principles and the art of judging in order to meet the needs of a changing society. This rule establishes the minimum requirements for continuing education of judicial officers.

We conclude that trial courts may properly consider annual judicial conferences in scheduling and rescheduling criminal trial dates, in that mandatory continuing judicial education is "required in the administration of justice"

within the meaning of former CrR 3.3(h)(2) and current CrR 3.3(f)(2). Accordingly, Judge Ramsdell did not err in taking the annual fall judicial conference into consideration when rescheduling Flinn's trial, and Judge Alsdorf did not err by rejecting Flinn's request for dismissal for violation of his speedy trial rights under the rule. Although neither judge explained on the record *why* the annual judicial conferences are required in the administration of justice, such an explanation was unnecessary. It is enough that Judge Ramsdell explained that he was working around the fall judicial conference in selecting the new trial date.

Issue 3: Did the trial court err by denying Flinn's CrR 8.3(b) motion to dismiss for prosecutorial mismanagement?

 Finally, Flinn contends that case should have been dismissed for prosecutorial mismanagement. A defendant must demonstrate (1) arbitrary action or government misconduct, and (2) prejudice affecting his right to a fair trial, in order to require dismissal under CrR 8.3(b). *State v. Michielli*, 132 Wn.2d 229, 239-40, 937 P.2d 587 (1997). Although mismanagement is sufficient to establish governmental misconduct, dismissal under CrR 8.3(b) is an extraordinary remedy used only in truly egregious cases. *State v. Wilson*, 149 Wn.2d 1, 9, 65 P.3d 657 (2003); *see, e.g., Michielli*, 132 Wn.2d at 243-45 (dismissal appropriate based on governmental mismanagement where prosecutor amended information to add four additional charges five days before the scheduled trial date despite having possessed all the necessary information regarding the defendant's actions since filing the original information five months before, with no explanation for the delay, forcing the defendant to give up his right to speedy trial or go to trial unprepared); *State v. Sherman*, 59 Wn. App. 763, 768, 801 P.2d 274 (1990) (dismissal proper where State agreed to produce complaining witness's Internal Revenue Service forms in the omnibus order but failed to produce them, and failed to move for reconsideration of the order until the day after trial was to have begun). A trial court's decision under

CrR 8.3(b) is reviewed for an abuse of discretion. *Michielli*, 132 Wn.2d at 240.

Here, although defense counsel stated several times at the September 9 hearing that the prosecutor had already had plenty of time to prepare, he did not actually request that the case be dismissed for mismanagement under CrR 8.3(b). Instead, defense counsel requested dismissal under CrR 8.3(b) on October 22, the first day of trial before Judge Alsdorf. He contended that the State had had 19 days prior to September 9 to prepare for the diminished capacity defense, and then received an additional five weeks after the continuance, and that all the prosecutor actually did to prepare was to make one phone call to Dr. Muscatel. Counsel argued that the prosecutor's actions constituted mismanagement and prejudiced Flinn by keeping him in custody for five weeks past the expiration of his speedy trial right for no purpose.

The prosecutor contended there was no mismanagement because he attempted, without success, to contact defense counsel before the September 9 hearing to obtain discovery, and when he learned, that day, that Dr. Muscatel had not used any other materials in reaching his opinion, he believed that he would need time for a second evaluation. As it happened, during the time between the September 9 hearing and trial, the prosecutor reviewed additional documentation provided by the defense, spoke with Dr. Muscatel, reviewed the matter with a supervising attorney in the prosecutor's office, and eventually determined that he did not need a second evaluation. Judge Alsdorf denied the motion to dismiss, stating that he would not reverse Judge Ramsdell's decision on the continuance, but did not make any specific findings regarding the CrR 8.3(b) motion.

On appeal, Flinn again contends that prosecutorial mismanagement is demonstrated by the prosecutor's failure to earlier contact Dr. Muscatel or to obtain a second expert during the three weeks prior to the September 9 trial date, and his additional failure to do anything more during the five week continuance than to call Dr. Muscatel. But the

prosecutor had a reasonable explanation for his actions. After receiving notice of the diminished capacity defense on August 21, the prosecutor attempted to contact defense counsel to request any materials Dr. Muscatel relied upon when preparing his report. Because defense counsel was on vacation, the prosecutor did not know that no such materials existed, and prepared a motion to compel discovery. At the hearing, when the prosecutor learned that there were no more materials, he asked for the continuance to obtain another expert because he believed that Dr. Muscatel's methodology called his evaluation into question. It was only after he talked to his supervisor—who had more experience with diminished capacity defenses—and interviewed Dr. Muscatel that the prosecutor decided not to obtain a second evaluation. Although the prosecutor might have been more efficient from Flinn's perspective, this record does not demonstrate the kind of egregious mismanagement requiring the extraordinary remedy of dismissal under CrR 8.3(b). Accordingly, we affirm Judge Alsdorf's ruling.

We affirm Flinn's judgment and sentence for possession of an incendiary device.

COLEMAN and AGID, JJ., concur.