# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 72660-9-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| BILL DWAYNE WHEELER, JR., | ) | |
| | ) | |
| Appellant. | ) | FILED: April 4, 2016 |

TRICKEY, J. — Bill Dwayne Wheeler, Jr. appeals his judgment and sentence for his conviction of sexual exploitation of a minor. He contends that the evidence is insufficient to support his conviction. He also contends that the trial court erred when it denied his motion to dismiss for outrageous government conduct, denied his motion to dismiss for mismanagement, denied his motion for a mistrial, admitted evidence in violation of ER 404(b), and did not give a unanimity instruction. Finding no error, we affirm.

## FACTS

In January 2013, the Everett Police Department received citizen complaints about female baristas engaging in lewd conduct at two drive-through Grab-N-Go espresso stands. The Grab-N-Go espresso stands are "bikini barista" stands, where the baristas dress in lingerie or bikinis. One stand is located on Everett Mall Way in the city of Everett. The other stand is located on Broadway Avenue in the city of Everett. Wheeler and James Wiley are co-owners of Grab-N-Go Espresso, Inc. Wheeler owns the Everett Mall stand, and Wheeler and Wiley own the Broadway stand.

In response to the complaints, the Everett Police Department's Special

Investigations Unit began an undercover investigation. On several occasions in January and February 2013, Detective Jeffrey Nevin visited the espresso stands and posed as a customer. During these visits, he observed female baristas engaging in sexually explicit conduct while serving customers. He saw baristas expose their breasts and other intimate areas to customers in exchange for tips. On many of these occasions, the baristas exposed themselves to Detective Nevin. He captured several of these incidents on video.

On one of Detective Nevin's visits, M.S. was working. While waiting in the line of cars, Detective Nevin watched M.S. expose her breasts to the customer in front of him. Detective Nevin then pulled up to the window. After making small talk, Detective Nevin asked M.S. if he could "get what the customer in front of [him] had."[1] M.S. climbed onto the windowsill and told Detective Nevin to put money in her underwear. He complied. M.S. then exposed her breasts to the detective and told him to come back and visit her.

After several weeks of undercover investigation, the detectives arrested the baristas for violating the city of Everett's adult cabaret and lewd conduct laws. After the arrests, the detectives learned that one of the baristas they arrested—M.S.— was 16 years old. The other baristas were adults. At this point, the detectives decided to shift their investigation to the owners of the stands.

Thereafter, the State charged Wheeler with one count of sexual exploitation of a minor. It alleged that Wheeler "on or about the 1st day of January, 2013, through the 20th day of February, 2013, aided, invited, employed, authorized, and

---

[1] Report of Proceedings (RP) (July 23, 2014) at 162.

caused a minor, to wit: M.S. . . . to engage in sexually explicit conduct, knowing that such conduct would be photographed and part of a live performance."[2] The Snohomish County Prosecuting Attorney and the Washington State Attorney General's Office gave Detective Nevin immunity for his role in the investigation.

Wheeler moved for a dismissal based on outrageous government conduct. He argued that Detective Nevin committed a crime by encouraging M.S. to engage in sexually explicit conduct and that his actions were so outrageous that it violated due process. The court later denied this motion.

The case proceeded to a jury trial. The State's theory of the case was that Wheeler invited or caused M.S. to engage in sexually explicit conduct through his business practices. The State argued that Wheeler was heavily involved in the operations of the business and that he put standards in place that forced M.S. to be competitive with other baristas working at the stands. The State argued that this was all part of Wheeler's plan to make money and to increase sales.

In support of its theory, the State presented testimony from several baristas, including M.S. In general, the baristas testified about the operations of the business, including pay structure and scheduling. They also testified about Wheeler's involvement in the business. They explained that Wheeler managed and monitored the stands, assigned the schedules, and set the rules. Additionally, the baristas testified about performing sexually explicit shows for customers. They explained that they earned more money when they performed shows, because they saw a significant increase in tips.

---

[2] Clerk's Papers (CP) at 452.

The State also presented testimony from Detective Nevin and Detective Jeffrey Shattuck. Detective Nevin detailed his role in the undercover investigation. The court admitted several of Detective Nevin's video recordings of the baristas performing sexually explicit shows. One of these videos depicted M.S. The other videos depicted adult baristas.

Detective Shattuck testified about recovering footage from a surveillance system that he had seized from the Everett Mall stand on March 6, 2013. He testified that he recovered approximately eight days of footage. He explained that he calculated this by counting back to the oldest recorded footage, which was from February 26, 2013.

Detective Nevin testified that he reviewed this footage. He stated that he observed approximately 37 sexually explicit shows in the eight days of footage. From this footage, the court admitted 10 videos clips that showed the baristas engaging in sexually explicit acts. The court excluded another video clip because it was cumulative and prejudicial.

At the close of the State's case, defense counsel informed the court that he had discovered that the surveillance footage did not include eight days of footage as the detectives had testified. The footage was missing March 4, 5, and 6 and contained duplicate footage. Wheeler moved for dismissal based on mismanagement. In the alternative, he moved for a mistrial or to strike Detective Nevin's testimony in its entirety. The court recessed for the parties to determine whether the surveillance system, which was at the Everett Police Department, had the missing footage.

Later that day, the court conducted a hearing outside the presence of the jury. Detective Shattuck testified at the hearing that the surveillance system was now corrupted and no longer worked. The parties were thus unable to determine whether it had the missing footage. Detective Shattuck also testified that he provided everything he had downloaded to the State, who in turn, provided it all to the defense.[3] He did not think that there ever existed any footage from March 4, 5, and 6. On cross-examination, Detective Shattuck admitted that the surveillance system was recording when he seized it on March 6 and that there should be footage until that date. He also admitted that if the system had remained plugged in, it is less likely that it would be corrupted.

After hearing argument from the parties, the court denied Wheeler's motions for dismissal, a mistrial, and to strike the testimony of Detective Nevin in its entirety. Over Wheeler's objection, the court issued a curative instruction, directing the jury "to disregard the testimony of Detective Nevin and Detective Shattuck that there was a total of eight days of video surveillance footage from the Everett Mall stand."[4]

The jury convicted Wheeler as charged. Wheeler appeals.

ANALYSIS

Sufficiency

Wheeler contends that the evidence was insufficient to sustain his conviction. He argues that, at most, the evidence showed that he tried to run a successful business. We disagree.

Due process requires the State to prove beyond a reasonable doubt all the

---

[3] RP (July 31, 2014) at 38, 51.
[4] RP (July 31, 2014) at 119.

5

necessary facts of the crime charged. State v. Colquitt, 133 Wn. App. 789, 796, 137 P.3d 892 (2006). "The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." Salinas, 119 Wn.2d at 201. "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." Salinas, 119 Wn.2d at 201.

Circumstantial evidence and direct evidence can be equally reliable. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). We must defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of evidence. State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

A person is guilty of sexually exploiting a minor if the person "[a]ids, invites, employs, authorizes, or causes a minor to engage in sexually explicit conduct, knowing that such conduct will be photographed or part of a live performance." RCW 9.68A.040(1)(b).

The words "aids, invites, employs, authorizes or causes" are not defined in the statute. In State v. Chester, our Supreme Court defined these terms after consulting a dictionary. 133 Wn.2d 15, 22, 940 P.2d 1374 (1997). The Supreme Court also stated that the terms require "some affirmative act of assistance, interaction, influence or communication on the part of the defendant which initiates

and results in a child's display of sexually explicit conduct." Chester, 133 Wn.2d at 22.

Here, to convict Wheeler of sexual exploitation of a minor, the jury had to find beyond a reasonable doubt that (1) "on or about the 1st day of January, 2013 through the 20th day of February, 2013, [Wheeler] did invite or cause a minor to engage in sexually explicit conduct;" (2) Wheeler "did know the conduct would be photographed or would be part of a live performance;" and (3) "these acts occurred in the State of Washington."[5]

The court instructed the jury that "'[i]nvite' means to offer an incentive or inducement; and requires some affirmative act of that nature on the part of the defendant."[6] It instructed the jury that "'[c]ause' means to be the cause of, to bring about, or to induce; and requires some affirmative act of that nature on the part of the defendant."[7]

In this case, there is no dispute that M.S. was a minor and that Wheeler knew that M.S. was 16 years old. There is also no dispute that M.S. engaged in sexually explicit conduct and that the conduct was part of a live performance. M.S. testified to these facts at trial. The contested issue is whether the State presented sufficient evidence to establish that Wheeler invited or caused M.S. to perform the shows. We conclude that it did.

Testimony at trial established that Wheeler did not pay his baristas an hourly wage. Each barista's pay was based solely on tips. The baristas testified that they

---

[5] CP at 145.
[6] CP at 146.
[7] CP at 147.

made significantly less money without giving shows then when they gave shows. Wheeler scheduled the baristas with the highest sales for the busier and more desirable shifts. Additionally, Wheeler set a sales quota for each shift. He required there to be $300 in the till after a weekday shift and $150 in the till after a weekend shift.[8] If the barista did not make her daily sales quota, Wheeler required her to make up the difference. This evidence supports the State's theory that Wheeler invited or caused M.S.'s conduct by setting up a business model that rewarded baristas for exposing themselves with better conditions and better income.

M.S.'s testimony further confirms the State's business model theory. M.S. testified that at the end of each shift, Wheeler would count the till. If the till was short, Wheeler would "make a comment or say, you need to make sure that you get your sales up to the volumes of that."[9] Significantly, M.S. offered the following explanation for why she performed sexually explicit shows for customers:

> Because there was a standard set by the girls that were doing it, all those things. *And there was pressure from [Wheeler] to, you know, you need to make more money and get more customers or you're not going to be on the schedule. And the girls that made the most money got put on the schedule.*[10]

M.S. explained that the girls set the standard by "giving other shows, the customers expect shows."[11] And she explained that the girls who gave shows had the most customers. M.S.'s testimony reveals that Wheeler's comments and practices invited or caused her to engage in sexually explicit conduct by pressuring her to make more money and get more customers in order to keep her job.

---

[8] RP (July 24, 2014) at 133.
[9] RP (July 24, 2014) at 136.
[10] RP (July 24, 2014) at 139-40 (emphasis added).
[11] RP (July 25, 2014) at 68.

8

Additionally, substantial evidence establishes that Wheeler knew that M.S. performed shows. M.S. testified that Wheeler was present during discussions about shows and how to avoid getting caught. She said that she had conversations about shows in front of Wheeler on two or three separate occasions. M.S. also testified that at the end of each shift, Wheeler reviewed surveillance footage from inside the stand. She further testified that she showed her breasts to customers a couple times per shift. Moreover, another barista testified that Wheeler told her that M.S. would let customers touch her and that M.S. performed shows. She testified that Wheeler knew this because he could monitor the stand's surveillance footage remotely from his cell phone.

Viewing this evidence in the light most favorable to the State, we conclude that it is sufficient to establish that Wheeler invited or caused M.S. to engage in sexually explicit conduct and that he knew it would be part of a live performance.

Wheeler points to evidence in the record that negates the State's theory. For example, the evidence established that one barista did not perform shows. Additionally, several baristas testified that Wheeler told them not to do shows. But we must defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of evidence. Thomas, 150 Wn.2d at 874-75. Accordingly, we reject this argument.

<u>Outrageous Conduct</u>

Wheeler contends that the trial court erred when it denied his motion to dismiss the charge against him based on outrageous government conduct. He relies on State v. Lively, 130 Wn.2d 1, 19, 921 P.2d 1035 (1996), to assert that

outrageous government conduct violated his due process rights.[12] We disagree.

"[O]utrageous conduct is founded on the principle that the conduct of law enforcement officers and informants may be 'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" Lively, 130 Wn.2d at 19 (quoting United States v. Russell, 411 U.S. 423, 431-32, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973)). For police conduct to violate due process, "the conduct must be so shocking that it violates fundamental fairness." Lively, 130 Wn.2d at 19. Examples of outrageous conduct include "those cases where the government conduct is so integrally involved in the offense that the government agents direct the crime from beginning to end, or where the crime is fabricated by the police to obtain a defendant's conviction, rather than to protect the public from criminal behavior." Lively, 130 Wn.2d at 21.

A claim based on outrageous conduct requires "more than a mere demonstration of flagrant police conduct." Lively, 130 Wn.2d at 20. "Public policy allows for some deceitful conduct and violation of criminal laws by the police in order to detect and eliminate criminal activity." Lively, 130 Wn.2d at 20. "Dismissal based on outrageous conduct is reserved for only the most egregious circumstances." Lively, 130 Wn.2d at 20.

In reviewing a defense of outrageous government conduct, the court evaluates the conduct based on the totality of the circumstances. Lively, 130 Wn.2d at 21. There are several factors to consider when determining whether

---

[12] Wheeler moved for dismissal pursuant to CrR 8.3(b) as well as the state and federal constitutions. On appeal, however, he relies solely on the state and federal constitutional right to due process to argue that dismissal was warranted.

police conduct offends due process: (1) "whether the police conduct instigated a crime or merely infiltrated ongoing criminal activity," (2) "whether the defendant's reluctance to commit a crime was overcome by pleas of sympathy, promises of excessive profits, or persistent solicitation," (3) "whether the government controls the criminal activity or simply allows for the criminal activity to occur," (4) whether the police motive was to prevent crime or protect the public," (5) "whether the government conduct itself amounted to criminal activity or conduct 'repugnant to a sense of justice.'" Lively, 130 Wn.2d at 22. Whether the State has engaged in outrageous conduct is a matter of law, not a question for the jury. Lively, 130 Wn.2d at 19.

In State v. Lively, our Supreme Court concluded that the State's actions constituted outrageous conduct in violation of the defendant's due process rights. 130 Wn.2d at 1. There, the State charged Amy Lively with two counts of delivery of cocaine after she made two deliveries at the request of the State's informant. At the time of the offenses, Lively was raising two small children alone. She had become addicted to cocaine and alcohol at age 14 and had sought treatment several times. Lively met the police informant at an Alcoholics Anonymous/Narcotics Anonymous meeting. She had recently attempted suicide and was emotionally distraught. The informant asked Lively out on a date two weeks after they met, and the two developed a close relationship and moved in together. The informant repeatedly asked Lively to obtain cocaine for him. Lively, 130 Wn.2d at 6-7. Lively had no criminal history prior to the events of the case and "no apparent predisposition" to engage in such conduct. Lively, 130 Wn.2d at

15. She ultimately complied with the informant's requests, and the State subsequently brought charges.

Relying on the factors outlined earlier, the Supreme Court determined that the State's conduct warranted dismissal of the charges. First, the informant did not infiltrate an ongoing criminal activity but instead established a relationship with Lively for the purpose of instigating a crime. Lively, 130 Wn.2d at 23. Second, Lively's reluctance to commit a crime was purposely overcome by the State by taking advantage of her emotional reliance on the informant. Lively, 130 Wn.2d at 24-25. Third, the informant controlled the criminal activity "from start to finish." Lively, 130 Wn.2d at 26. Fourth, the government conduct demonstrated a greater interest in creating crimes to prosecute than in protecting the public from criminal behavior. Lively, 130 Wn.2d at 26. Fifth, and most importantly, the conduct was "so outrageous that it shock[ed] the universal sense of justice." Lively, 130 Wn.2d at 26.

The conduct in this case is far different from that in Lively. There, the informant contacted an emotionally vulnerable woman with no predisposition to engage in illegal activity for the sole purpose of involving her in police sponsored drug activity. There was no demonstration that she was involved in criminal activity prior to the State's involvement. Here, in contrast, Detective Nevin did not establish a relationship with M.S. for the purpose of instigating a crime. Rather, he was at the espresso stand to investigate ongoing criminal activity. M.S. was already engaging in the illegal activity when Detective Nevin contacted her. In fact, Detective Nevin directly observed M.S. engage in illegal activity before he asked

her to repeat the illegal conduct. Additionally, in contrast to Lively, M.S. was not reluctant to engage in such conduct. She agreed after Detective Nevin asked her once. And although Detective Nevin initiated M.S.'s conduct on that one occasion, he did not control her criminal activity from start to finish.

Further, Detective Nevin's motive was to prevent further crime. The detectives were responding directly to citizen complaints. Unlike in Lively, the government conduct in this case demonstrates a greater interest in preventing criminal behavior than in initiating it.

As the State admits, Detective Nevin's conduct was technically a crime. It is not a defense to a charge of sexual exploitation of a minor that the person did not know the alleged victim's age. RCW 9.68A.110(3). Nor is it a defense that the individual was involved in law enforcement activities in the investigation of criminal offenses. RCW 9.68A.110(1).

But as Lively noted, public policy allows for some deceitful conduct and violation of criminal laws by the police in order to detect and eliminate criminal activity. 130 Wn.2d at 20. Washington courts have rejected the outrageous conduct defense even in cases where police engage in illegal activities. State v. Markwart, 182 Wn. App. 335, 349-50, 329 P.3d 108 (2014). For example, in State v. Jessup, this court held that dismissal was not warranted based on the fact that a government agent engaged in acts of prostitution. 31 Wn. App. 304, 313-14, 641 P.2d 1185 (1982). Here, there is no evidence that Detective Nevin knew that M.S. was underage or that any of the baristas working at the stand were underage. Detective Nevin's conduct was not so outrageous that it violates fundamental

fairness. The circumstances of this case do not support dismissal.

## Mismanagement

Wheeler argues that the trial court abused its discretion when it denied his CrR 8.3(b) motion for dismissal based on the State's purported mismanagement of a video surveillance system that it had in evidence. We disagree.

CrR 8.3(b) provides:

> The court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's rights to a fair trial.

In order to succeed on a CrR 8.3(b) motion to dismiss, the defendant must show by a preponderance of the evidence "(1) 'arbitrary action or governmental misconduct' and (2) 'prejudice affecting the defendant's right to a fair trial.'" State v. Rohrich, 149 Wn.2d 647, 654, 71 P.3d 638 (2003) (quoting State v. Michielli, 132 Wn.2d 229, 239-40, 937 P.2d 587 (1997)). "Although mismanagement is sufficient to establish governmental misconduct, dismissal under CrR 8.3(b) is an extraordinary remedy used only in truly egregious cases." State v. Flinn, 119 Wn. App. 232, 247, 80 P.3d 171 (2003).

We review a trial court's decision to dismiss charges under the abuse of discretion standard. Michielli, 132 Wn.2d at 240. A trial court abuses its discretion when its decision is manifestly unreasonable or is exercised on untenable grounds or for untenable reasons. Michielli, 132 Wn.2d at 240.

Here, as we explained earlier, the footage from the surveillance system did not include eight days of footage as the detectives had testified. The footage was

missing March 4, 5, and 6. At trial, the parties were unable to determine whether the surveillance system in evidence had the missing footage, because the surveillance system had become corrupted. Detective Shattuck did not know the reason for this, but he testified that if the surveillance system had been plugged in, it was less likely that it would be corrupted. Based on this, Wheeler moved for dismissal under CrR 8.3(b) for the State's failure to maintain the surveillance system by keeping it plugged in.

The trial court denied Wheeler's motion. It noted that the issue of the missing footage should have been explored earlier. Additionally, it stated that the significance of this footage was speculative. And it stated that because the record was unclear about why there was no footage from March 4, 5, and 6, "the notion that there is real mismanagement on this particular point is speculative."[13] The court determined that the error could be corrected with a curative instruction.

The court's ruling was not an abuse of discretion. The State provided Wheeler with all of the surveillance footage that it had downloaded. It is unclear whether footage from March 4, 5, and 6 ever existed on the surveillance system. It is also unclear whether the State was responsible for the lack of any footage from those days. Accordingly, this record does not show by a preponderance of the evidence mismanagement on the part of the State.

Further, Wheeler fails to show that the alleged mismanagement prejudiced his right to a fair trial. As the court noted, the significance of any missing footage was speculative. Moreover, the trial court's instruction to the jury cured any

---

[13] RP (July 31, 2014) at 103.

prejudice resulting from the erroneous testimony. Despite Wheeler's assertion to the contrary, the trial court did not place the burden on the defense to correct the State's mismanagement. The facts of this case do not show egregious conduct warranting dismissal.

### Mistrial

Wheeler argues that the court abused its discretion when it denied his motion for a mistrial based on mismanagement. We disagree.

To determine whether a trial irregularity warrants a new trial, we examine the seriousness of the irregularity, whether it involved cumulative evidence, and whether the trial court properly instructed the jury to disregard it. State v. Emery, 174 Wn.2d 741, 765, 278 P.3d 653 (2012). "[A] trial court should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can ensure that the defendant will be fairly tried." Emery, 174 Wn.2d at 765.

We review the trial court's denial of a motion for a mistrial for abuse of discretion. Emery, 174 Wn.2d at 765. Denial of a mistrial should be overturned only when there is a "'substantial likelihood'" that the error affected the jury's verdict. State v. Rodriguez, 146 Wn.2d 260, 269-70, 45 P.3d 541 (2002) (internal quotation marks omitted) (quoting State v. Russell, 125 Wn.2d 24, 85, 882 P.2d 747 (1994)).

Here, the trial court did not abuse its discretion when it denied Wheeler's motion for a mistrial after the parties discovered that there was missing surveillance footage and the detectives erroneously testified that there was eight days of footage. The admission of the erroneous testimony was not serious

because the precise number of days of video footage was minimally relevant to the issues before the jury. Further, the detectives' mistaken understanding about the number of days of footage did not affect their testimony about the content of the footage. And the detectives' testimony about the content of the footage was cumulative with much of the other evidence presented at trial. Moreover, the erroneous testimony was cured by the court's instruction to "disregard the testimony of Detective Nevin and Detective Shattuck that there was a total of eight days of video surveillance footage from the Everett Mall stand."[14] In short, there is not a "substantial likelihood" that the error affected the jury's verdict.

## False Testimony

Wheeler argues that his conviction should be reversed because "the case went to the jury with false testimony."[15] We disagree.

The due process clause of the Fourteenth Amendment imposes on prosecutors a duty not to introduce perjured testimony or use evidence known to be false to convict a defendant. Napue v. People of State of Ill., 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). This duty requires the prosecutor to correct state witnesses who testify falsely. Napue, 360 U.S. at 269; State v. Finnegan, 6 Wn. App. 612, 616, 495 P.2d 674 (1972). "A conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." State v. Larson, 160 Wn. App. 577, 594, 249 P.3d 669 (2011).

---

[14] RP (July 31, 2014) at 119.
[15] Opening Br. of Appellant at 39 (boldface and capitalization omitted).

17

Here, the State did not use false evidence to obtain a conviction. Although both Detective Nevin and Detective Shattuck erroneously testified that they recovered and reviewed eight days of surveillance footage, the court corrected this testimony with a curative instruction "to disregard the testimony of [the two detectives] that there was a total of eight days of video surveillance footage from the Everett Mall stand."[16] We presume that the jury followed the court's instructions. Emery, 174 Wn.2d at 766.

Wheeler argues that the curative instruction was inadequate. He asserts that the jury "was not told that the footage contained duplication or that footage that was on the system when the police took it was lost and could not be recovered."[17] And he asserts that the instruction "ignores that there were substantial problems with the footage that was captured and the testimony that thirty-seven shows by baristas were on the footage."[18]

But there is no showing on this record that the missing footage affected the detectives' testimony about the content of the remaining footage. Thus, Wheeler fails to show that the detectives' testimony was false. Moreover, testimony about the precise number of days of video or precise number of shows by the baristas on the footage was minimally relevant. Thus, there is not a reasonable likelihood that false testimony on these issues could have affected the judgment of the jury.

Evidentiary Ruling

Wheeler argues that the trial court abused its discretion in admitting

---

[16] RP (July 31, 2014) at 119.
[17] Opening Br. of Appellant at 39.
[18] Reply Br. of Appellant at 18.

18

evidence of alleged prior bad acts of the adult baristas. Although he acknowledges that some of this evidence was relevant and admissible, he claims that the quantity of evidence was unfairly prejudicial. We reject his claim.

Under ER 404(b), "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Such evidence may be admissible for other purposes, however, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b). Another proper purpose is to show the existence of a common scheme or plan. State v. Gresham, 173 Wn.2d 405, 421-22, 269 P.3d 207 (2012).

To admit evidence of a person's prior misconduct, the trial court must "'(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.'" Gresham, 173 Wn.2d at 421 (quoting State v. Vy Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)).

We review a trial court's decision to admit evidence under ER 404(b) for abuse of discretion. State v. Fisher, 165 Wn.2d 727, 745, 202 P.3d 937 (2009). A trial court abuses its discretion only when its decision is manifestly unreasonable or based on untenable grounds. State ex rel. Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

Here, prior to trial, Wheeler moved in limine pursuant to ER 404(b) to exclude any evidence that adult baristas performed "shows" or engaged in lewd

conduct.[19] He argued that such evidence was not indicative of a common scheme or plan, because M.S. was the only minor. He also argued that the evidence was not relevant and was more prejudicial than probative.

The trial court questioned whether ER 404(b) applied, noting that the conduct was not Wheeler's prior conduct but rather was conduct of third parties. Nonetheless, it applied ER 404(b) by analogy and determined that the evidence was admissible. First, it stated that at least a portion of the evidence was admissible under the res gestae exception. The court then conducted a thorough analysis of the four ER 404(b) factors on the record. It concluded that the evidence was relevant to show a common scheme, plan, or business practice at the espresso stands and to show Wheeler's knowledge. The court noted that the evidence was prejudicial in the sense that it was "unpleasant," but because the evidence was not of Wheeler's actions, the court reasoned that it was not the same kind of "direct prejudice."[20] Because the relevancy of the evidence was "significant," the court determined that the potential relevance outweighed the potential prejudice and the evidence was admissible.[21]

At trial, the court admitted testimony from two detectives and five baristas detailing the adult baristas' sexually explicit shows. It admitted several video recordings taken by Detective Nevin that depicted the baristas giving sexually explicit shows. And it admitted several video clips from the Everett Mall stand's surveillance system that depicted the baristas giving sexually explicit shows.

---

[19] CP at 205.
[20] RP (July 23, 2014) at 36-37.
[21] RP (July 23, 2014) at 37.

Wheeler did not object to any of this evidence on the basis that it was cumulative. Nonetheless, the court excluded one clip from the surveillance system due to its cumulative and prejudicial nature.

Assuming that Wheeler preserved the argument he raises on appeal, we conclude that the trial court properly exercised its discretion when it admitted this evidence. As the court stated, evidence that the adult baristas performed shows was highly relevant. Wheeler concedes this point, stating that "[s]ome testimony about the business structure and culture of the espresso stands was relevant to both guilt and innocence of the charged crime."[22] Further, this evidence was less likely to invoke a negative emotional response toward Wheeler because it was not evidence of his prior conduct but rather the conduct of third parties. Finally, the record shows that the court carefully considered the nature of each video clip and its probative value before determining whether it should be admitted. It did not abuse its discretion when it excluded only one video clip.

<u>Unanimity Instruction</u>

Wheeler argues that his conviction must be reversed because the trial court failed to give a unanimity instruction. We disagree.

Criminal defendants in Washington are entitled to a unanimous jury verdict. State v. Ortega-Martinez, 124 Wn.2d 702, 707, 881 P.2d 231 (1994). When the State presents evidence of several acts that could form the basis of one count charged, either the State must elect the act it relies on for the conviction or the court must instruct the jury to agree on a specific criminal act. State v. Kitchen,

---

[22] Opening Br. of Appellant at 28.

21

110 Wn.2d 403, 409, 756 P.2d 105 (1988). If neither of these alternatives occurs, a constitutional error arises because of the possibility that some jurors may have relied on one of the criminal acts while other jurors relied on another, resulting in a lack of unanimity on all of the elements necessary for a conviction. State v. Greathouse, 113 Wn. App. 889, 916, 56 P.3d 569 (2002).

No election or unanimity instruction is required, however, if the evidence shows that the several acts constitute a "'continuing course of conduct.'" State v. Handran, 113 Wn.2d 11, 17, 775 P.2d 453 (1989) (quoting State v. Petrich, 101 Wn.2d 566, 571, 683 P.2d 173 (1984)). We evaluate the facts in a commonsense manner to decide whether criminal conduct constitutes a continuing course of conduct. Handran, 113 Wn.2d at 17.

Generally, where the evidence involves conduct at different times and places, then the evidence tends to show several distinct acts rather than a continuing course of conduct. Handran, 113 Wn.2d at 17. Merely having the same victim is not enough in itself to demonstrate that the offense was one continuing offense. State v. Fiallo-Lopez, 78 Wn. App. 717, 724, 899 P.2d 1294 (1995). But "evidence that a defendant engages in a series of actions intended to secure the same objective supports the characterization of those actions as a continuing course of conduct rather than several distinct acts." Fiallo-Lopez, 78 Wn. App. at 724.

In State v. Barrington, this court concluded that the defendant's acts were a continuing course of conduct rather than separate distinct acts. 52 Wn. App. 478, 481-82, 761 P.2d 632 (1988). There, the defendant promoted a prostitution

enterprise over three months, involving one woman and a "single objective—to make money." Barrington, 52 Wn. App. at 481. This court reasoned that the incidents of prostitution "were primarily illustrative of the nature of the enterprise rather than solely descriptive of separate distinct acts or transactions." Barrington, 52 Wn. App. at 481. It concluded that neither a unanimity instruction nor an election was required. Barrington, 52 Wn. App. at 482.

Division Two applied Barrington's reasoning in State v. Knutz, 161 Wn. App. 395, 409, 253 P.3d 437 (2011). Over the course of three years, Lisa Knutz had obtained several cash loans from Robert J. Von Gruenigen after proffering various lies. Knutz, 161 Wn. App. at 399-400. Division Two, reasoning that "Knutz used Von Gruenigen 'to promote an enterprise with a single objective'—to obtain money through deceit," concluded that Knutz's several acts of fraud constituted a continuing course of conduct. Knutz, 161 Wn. App. at 409.

Here, M.S. testified that she worked at the Broadway stand twice and the Everett Mall stand five to eight times. She testified that she showed her breasts to customers "[a] couple times per shift."[23] Wheeler argues that each time M.S. exposed her breasts was a separate act. In response, the State asserts that the facts of this case show a continuing course of conduct for which no unanimity instruction was required.

We agree with the State. The facts of this case show a continuing course of conduct. Barrington and Knutz focus on the conduct of the defendant in the course of committing the crime, not on the actions of the victims. Like in those

---

[23] RP (July 24, 2014) at 141.

23

cases, Wheeler's conduct showed that he used M.S. to promote an enterprise with a single objection—to make money through the baristas' sexually explicit acts. Similar to Barrington, where the incidents of prostitution "were primarily illustrative of the nature of the enterprise rather than solely descriptive of separate distinct acts or transactions," the explicit shows by M.S. were also illustrative of the nature of the enterprise. 52 Wn. App. at 481. Viewed in a commonsense manner, the evidence supports the conclusion that Wheeler engaged in a continuing course of conduct. No unanimity instruction was required.

We affirm the judgment and sentence.

Trickey, J

WE CONCUR: